I'm representing the appellant Randy Blades, and I believe it's actually in your honor to pronounce Grube. Grube. Isn't that right? Zero plus zero plus zero still equals zero. What we have here are three claims alleging a Brady violation. And while the state recognizes that Brady violations or claims have to be viewed cumulatively, because there were no Brady violations, we still have zero. We still have no violation. We have no due process problem in this case. Well, the Idaho Supreme Court thought there was a Brady violation in failing to turn it over. Well, I think we have. At least in the Gifford, I thought they found that your argument of lack of due diligence on Gifford didn't apply, at least with respect to his observations of Officer Baroud. So you're saying they decided that it wasn't material, but they didn't? And that's why, Your Honor, I talked in terms of a Brady violation, because you have to look at those cumulatively in determining materiality. Well, they didn't do that. And I believe that that's correct, Your Honor. And that's why we said because there was no – it wasn't. I'm not understanding your argument, then, because you said – you admit that they didn't do it cumulatively, but there was no Brady violation. They didn't look – they didn't – they looked at the individual claims and examined them very carefully and said, individually, there's no violation here. Well, okay, let's just sort it out. Okay. There was a failure of your Brady obligation to disclose the Gifford interview, correct? There's no question that there was suppression of that particular – Okay. And the same is true with respect to the logbooks. That is not correct, Your Honor. We disclosed those logs well prior to – You didn't disclose the information that the prosecution had with respect to the suppression of the – or the falsification of the logbooks. We did not disclose that the logbooks had been – and I'm going to use this phrase very generically because – You don't have to quote. We can look at it. Altered is the word that I use. Well, even the Idaho Supreme Court said that they were altered. They knew what was – they saw what was done, and they even understood what they were relevant to. The problem that I have with the word – Why not doctored? I'm sorry? Why not doctored, which is the case – the word I would use if I were writing an opinion about this case. I would use the word doctored. Why isn't that the right term? The reason I don't like those particular terms, Your Honor, is because it infers an evil intent in my own mind. And I don't believe that there was an intent to cover up anything here. You can argue that to the jury, I suppose. Yeah, exactly. Certainly, certainly. Don't you think changing the mileage and changing the time on the night of the murder from an alternative suspect raises a suspicion? And when you say the – when you say the Court carefully looked at it, when I see statements by this Court – by the Court below, the State court below, I find actually some of them absurd when they say this sort of evidence wouldn't be relevant or we have no idea how this alteration would be relevant to a jury. I think it would be relevant to a jury. Well, the problem is we don't know who made the alterations. Chief Sivik said he made the alterations. Their expert at the post-conviction hearing concluded that it was Brewd that made at least one alteration. But even the 230 around the – at the bottom, nobody disputed that that was Chief Sivik. The 41 on the mileage change and the – The same guy whose fingerprints appear on the electric bar? I'm sorry, Your Honor. The guy whose fingerprints appear on the electric box? They weren't able – no. They weren't able to ascertain the fingerprints on the electric box, Your Honor. And I'm not – I think it was Chief Sivik, sir. My understanding of the record in the trial transcript was – and this is a follow-up question I have for you. There were fingerprints on the electric box, and in the trial it was established that the fingerprints were not that of the convicted gentleman. But they were that of Officer Sivik. And I am really puzzled why the prosecution didn't pursue that. Let's keep in mind the electricity apparently was off for 45 minutes. One of the two officers in the town has his fingerprints on the electric box. And that, I do believe, is in the record. And I wonder why the prosecution didn't make a point of that. And, Your Honor, Chief Sivik's prints may have been on there. I thought you were referring to Officer Brute's fingerprints. His were not. Then you must not be listening because we both said Chief Sivik. You were talking about Chief Sivik, and then I said the same guy whose fingerprints are on the electric box, and then he went into a big no. And I apologize, Your Honor. I thought you were referring to Officer Brute. And I do apologize. But the problem that I have is that if you look at the So why don't you answer Judge Guilford's question? Why on God's earth is Idaho not pursuing a promising lead like that? The girl is murdered. There's a 45-minute gap in the time of the clocks in the house. And they go, so the inference is somebody turned off the electricity. They go there. The only friends they can find are the chief of police, the chief of police who happens to be the boss of the only other suspect. You know, it sounds a little bit odd to me. And I think what Judge Guilford is asking is why aren't prosecutors pursuing that lead? I don't know that they didn't, Your Honor. Well, let me bring it to the issues in this case. You were saying that there was a full disclosure of the log, and I'm sure, as your brief said, you would argue that it was up to the defense to find the alteration, doctoring, whatever. I'm wondering if that highest standard should apply in a situation where there is an officer suspect and a citizen suspect. The fingerprints on the electric box suggest there's reason to have an officer suspect. And I'm wondering, in that situation, when the government suppresses and the citizen gets convicted, doesn't that even raise a higher standard of what should be turned over, specifically concerning the logs? Are we really saying that when you are a suspect, you can provide something, not fully disclose the alteration, and leave it for the defendant to find it? Because if he doesn't find it, he's convicted and not the government officer. The problem that I have with the due diligence exception that was found by the district court, and that is what your Honor has described, that there's a different standard for evidence created by the police, is that I am unaware of any case in the country that has created such an exception to the due diligence standard, which, of course, raises the Teague argument that we raised in our brief. Let's avoid the Teague argument and come back to the notion that you are, as the prosecution, constructively charged with information in the hands of the police. And in this case, fortuitously or not, the investigative folks also happened, and one of them happens to be, and maybe both of them, suspects. You are charged with their knowledge. Their knowledge was that they had made alterations. That was not disclosed. And so the Idaho Supreme Court saying that the only new information that could be looked at was the fact that the forensic expert came along, therefore they didn't even get to the materiality thing doesn't seem to hold up. I mean, why isn't it clear that if a police officer has the information, the fact that it may be inculpatory of the officer doesn't relieve the prosecution, because you have an officer-involved shooting. And somebody is being charged with killing somebody, and the officer actually is the one who fired the shot. There's no question that the state has a duty to disclose that which the officers know. But what I'm saying, and what I believe the district court did, was actually expanded Brady and expanded another case, NAPUE, which is the case that deals with the prosecutor correcting false information within the courtroom. And that's what the district court did, was actually combine those two cases. Let's get away from it. I'm just saying, you've already answered. Haven't you answered the question? As long as you have the obligation to disclose, there's no dispute that Brood and the chief knew that they had been altered. They knew it. They'd done it. I'm not going to concede that Brood did. Certainly Seebeck did. Well, okay. But certainly Seebeck did. So didn't you have an obligation to disclose that? Again, Your Honor, I hate to keep coming back to the same thing. Then don't. Let's try something else. That's obvious. No, no, wait a minute. You had, even the Idaho Supreme Court said it wasn't that obvious. Didn't they say that? They wouldn't have known without the information from Gifford. They said specifically on this. They say, you know, they wouldn't be expected to go pick this up. I don't. I see you have the log page. So why don't you use it to show us how it's not obvious. How it is obvious? The mileage change right here from the 5 to the 6 is very obvious. Yeah, but the totals looks pretty obvious. From where to where? It's the end mileage in the upper left-hand corner, Your Honor. Page 28 of the excerpts. The 230 in the bottom. It didn't jump out at me. Well, it certainly jumped out at defense counsel. As they conceded in their affidavit, as their expert testified to at the State evidentiary hearing, that that's an obvious alteration. Well, if you give it to an expert, but do you have an obligation to take everything that's given to you by the government in Brady and pass it to an expert to make sure it's not doctored? What I'm saying, Your Honor, is that defense counsel recognized the change on their own before taking it to the expert and then decided to take it to the expert when they saw the alteration. That would appear to me that defense counsel knew and then had a duty to do. I'm sorry. This is before the first trial? This is before the trial? They took it to an expert? No, Your Honor. It was certainly after the trial, after Gifford had come to them and talked to them. Defense counsel looked at the log. I'm sorry. Gifford is who? Gifford is the individual that was not disclosed. Oh, Gifford, the witness, right. Yes. But there you go. It only became obviously relevant after we learned, after it was learned of the Gifford interview. So by withholding the Gifford interview, the relevance of this was not entirely apparent. Not entirely apparent, but, again, you can look at it and there are – Or why would you think, if you thought there was an alteration here, why would you think it's – I mean, maybe somebody just made a mistake in writing that number and they correct themselves. Sometimes, you know, have you ever written a check and written the wrong amount and then you sort of overwrite it? If you don't have a hypothesis, if you don't have a theory as to why this alteration might be incriminating, then you would just say, well, it's nothing specific. So you need this guy Gifford to come along to – On the other hand, if they say, oh, by the way, be aware when we're giving you this piece of paper that these two changes, 230 and 6-9, were changed not at the time the thing was created, but later. Now that's a very different – that's very different from writing a check and changing the amount right there on the spot because you wrote – you know, you just started writing the wrong number or started writing the wrong date. You start writing 2006 and you say, oh, I meant to do a 7. Very different from taking a check later on and changing it. I don't disagree particularly with you, Your Honor, except that one of their primary defenses was police cover-up and conspiracy. Here's what the Idaho Supreme Court said. It said, until the Gifford testimony was developed, the relevance of the police logs for the night of Amy Hosner's murder was not readily apparent. The logs were examined to verify which officer was on duty and which officer had filled in the daily log and could have been used to argue to the jury that not only did Officer Brood commit the murder, but that he was involved in a cover-up to hide his involvement. Once they know that Gifford puts Brood on the streets later than was being represented, now it becomes relevant. Up to that point, they were simply looking at it to decide, you know, who was on duty. And that's all they had reason to look at at that point. Now they've got a witness who says, by the way, I saw Brood out there an hour, hour and a half later than he testified. Now, yeah, looking at them, sure, you're darn right it suddenly becomes relevant. And the problem that I have with that, Your Honor, is when you look at all of the evidence they tried to present regarding this cover-up, it's extraordinarily difficult for me not to look at particularly the 230, which is written around the keyhole or the hole punch. Is that the kind of – is that piece of paper you're holding, that Xerox copy, is that the quality of what they got when they were looking at it?  Well, I'll tell you. I looked at that, and if it had been pointed to me, it's a little hard for me. I can't even on my copy see the hole. I mean, I can now look at it when it's pointed out to say that that is so clear and leap out at me. It's another point that Judge Kaczynski points out, and that is the timing. When you know when the hole was punched, then you might be able to deduce something about the fact that the alteration goes around the hole, but we don't particularly know when the hole was punched. The defense wouldn't know when the hole was punched, but the State would. No. The defense wouldn't have known at the time that they got this particular document, but it certainly should have alerted them to at least inquire. You know, this is all very interesting. What really I find most troubling is the State of Idaho, through its attorney general, is insisting on maintaining on the books a conviction of a guy who might, in fact, be innocent, because I think you and your boss, attorney general, must know in your hearts that if this evidence had been presented to a jury or presented to a jury today, it would be highly unlikely that Mr. Gruber would be convicted. And I would think that the attorney general of Idaho, like the attorney general of North Carolina yesterday, would be more interested in doing justice and making sure that innocent people are not convicted and making sure that guilty people are pursued and convicted instead of holding on to a conviction that is incredibly thin on the facts and undermined by just unspeakable misconduct. The idea that the police would dock the laws and hand them over like this, it is the kind of thing that I would think an attorney general would pursue with a vengeance and make sure that the people who committed these alterations are the ones who wind up behind bars rather than sitting here years later trying to stick back into prison somebody who didn't get a fair trial. Your Honor, seeing my time is up, I'd like to respond to the question. I don't need you to respond. What I'm charging you with is going back and talking to your boss, attorney general, and telling him that we expect, at least I expect, that he will look at this case and look at the misconduct in the case and look what fairness and justice requires rather than doggedly pursuing a conviction that might, or quite possibly is, or maintaining a conviction that is quite possibly of the wrong man. You have one of our finest district judges in our circuit, Judge Windmill, Chief Judge Windmill, who is certainly not a wild-eyed liberal, very fair man, very thoughtful man, very smart man, having looked at this case and come to the conclusion that I would have thought that an attorney general would simply accept that and move on and then take the consequences of what the district judge's findings are and apply them to make sure that the law enforcement does not, in fact, engage in this kind of misconduct in the future. I mean, surely you can't be proud of the fact that your police are docking documents. Certainly not, Your Honor. Has anybody been prosecuted for the doctrine? No, Your Honor. Why not? Well, because, Your Honor, to prosecute someone, you have to have criminal intent. And I don't believe that there's any criminal intent based upon the evidence. Was an investigation opened into that? Was anybody looked into whether there was criminal intent? I can't definitively answer that, Your Honor. Somebody is involved in a criminal case. A deputy is a suspect. His boss's fingerprints appear on the box, on the electrical box of the victim's house. The same police department and the same two officers, at least the boss, docked as a police log, which has the effect of making it less likely that a deputy will be looked after. Maybe the deputy is totally innocent, but it certainly makes it less likely he'll get into trouble. They don't provide evidence of this witness that comes forward. And you guys in Idaho just let that go because there's no criminal intent? Now, why don't you talk to the attorney general, okay? Tell him it's very disappointing to see that kind of behavior on the part of a law enforcement officer in our circuit and that it diminishes his credibility with this court in other cases. I will certainly talk to the attorney general, Your Honor. And I'm not before this court espousing the wonders of this investigation. It was messed up from the beginning, and that's why it took so long. And why, then, does the attorney general not take his responsibilities as chief law enforcement officer of the state seriously? And when police mess up in this way, why has he not pursued a criminal investigation? You know, that's something that you all ought to ask yourself rather than trying to stick this guy back into prison. There are also some issues about the doctored shotgun, too. And it might be looked into. The evidence is pretty strong evidence from experts and otherwise that the shotgun was scraped across the sill to create evidence. Well, and I think that was extensively litigated, Your Honor, during the course of the trial. That is probably why Judge Kaczynski didn't bring it up, and perhaps I shouldn't have. If there are no other questions. No. I think it's easily worth bringing up. We will withhold submission of this case for a week. And if the attorney general chooses to dismiss within that week, then he won't get an opinion. If you do, you will get an opinion. And whether it be the majority opinion or the concurrence or the dissent, we will pull no punches. I understand. Please, anything I write. Now, the last time I was in this court is when I said this to a bunch of lawyers, and they didn't believe me. You might look up the case. It's called Franz, F-R-U-N-Z. Your Honor, I don't have to look up the case. I am very familiar when this court says that. The lawyer was standing there, and I said, settle. And they blew me off. Okay? We'll give you a week. If the attorney general chooses to dismiss the case, then, of course, it will be the end of it. If not, I guess we'll have to decide it.  Judge Kuczynski, dismiss the case or dismiss the appeal? I may dismiss the appeal. I may dismiss the case before us. And that's what I assume. We're not finding him actually innocent. Yes. That's what I assume the court meant, because I do know that if I said anything else or I sound like I said anything else, obviously, we have jurisdiction over our own case. No, and I understand that. And I do know that both parties, in fact, have engaged in official investigation in this case in the event that this court would affirm Judge Windmill's decision and Mr. Groob would have to be retried. I do know that that is taking place. Well, presumably, in the context of that, the attorney general would want to take a look at the alternative sources. That would be certainly one way to investigate the allegations against Brood and apparently now against the chief of police. And I do believe those were and have been investigated, Your Honor. Maybe so. Maybe so. I believe so. You know more than we do. In any event. Thank you. Thank you, Your Honor. Thank you. Anything to add? Your Honor, I'm fine. My name is Dennis Benjamin. With me is Gregory Muller. Mr. Muller has been with Mr. Groob's case the entire time, the first felony case he ever tried to adjourn. That may be. The question is, do you have anything to add? Yes, Your Honor. I think I have two things to add. You heard earlier in the day the admonition about knowing when to close your book. The electric box did clearly have Mr. Seebeck's fingerprints on it. I cite to 625. Were those established at the time of the murder or was it part of the investigation where somebody had to go over and look at it? There were latent prints taken that day from the box at trial. Mr. Kerchesky, who is our state fingerprint examiner, said there were four or five from the chief of police by the name of Seebeck that were on that box. When were they put on? Well, we don't know. Right, you don't. So it may well have been that he was the one who went over and checked out the electrical box and in the course of his investigation didn't use rubber gloves and, therefore, he left his prints on the box. That is possible. Okay. But you had a question, the court had a question of whether it was established that there were his prints. There were his prints on the box. Okay. The alterations were not obvious. We know that because the state intended to try to impeach Mr. Gifford right before the post-conviction hearing by showing him the logs, the original logs, and saying you can't be right because Seebeck was on duty. Now, that was the very, very first time that Mr. Moeller and co-counsel ever saw the original of the logs. Prior to that time, the state was saying we have lost the originals and the day before the evidentiary hearing they find the originals and that's when they notice the alterations. Thank you. Thank you. Okay. Just argue we'll stand submitted. No. By deferring submission, we give the Attorney General a chance to do the right thing. In any event, we are adjourned. All rise. This court's discussion stands adjourned.
judges: Kozinski, Fisher, Guilford